# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| SEAN L. H.,[1]<br><br>　　　Plaintiff,<br><br>vs.<br><br>MARTIN O'MALLEY,[2]<br>Commissioner of Social Security,<br><br>　　　Defendant. | No. 23-CV-3008-KEM<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

_____

Plaintiff Sean H. seeks judicial review of a final decision of the Commissioner of Social Security denying his applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Plaintiff argues that the administrative law judge (ALJ) erred in failing to include fatigue as a severe impairment at step two and in limiting his residual functional capacity (RFC) to light work. I **affirm** the ALJ's decision.

## I.　　BACKGROUND

Plaintiff (born in 1968) has worked a variety of jobs over the years. In 2009 and 2010, he worked as a customer service manager for an airline. AR 40-41, 182.[3] He did

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Martin O'Malley is substituted for his predecessor in accordance with Federal Rule of Civil Procedure 25(d).

[3] "AR" refers to the administrative record, filed at Docs. 9-2 to 9-160. Although the record encompasses many docket entries, it contains many duplicative treatment records and lengthy treatment records covering a single event; and the final two-hundred-page exhibit is (inexplicably) filed in two-page increments.

not work from 2011 to 2015 and filed for disability benefits twice during that time (his applications were denied at the state-agency level). AR 70, 185. In 2016 and 2017, he worked a desk job, entering data for a hospital's billing department; he also had his first lower back surgery in 2016 (a right lumbar laminectomy and microdiscectomy at L4-5). AR 41, 180, 884, 1266. In August 2017, he began working full-time as the manager of a nutrition store. AR 42-44, 180, 225, 251. After Plaintiff re-injured his back lifting boxes at work, surgeons repeated his prior back surgery in May 2018. AR 884, 1266. The surgical site became infected, and Plaintiff underwent wound irrigation and debridement in June 2018. *Id.* He filed a worker's compensation claim against the nutrition store. AR 44. In September 2018, he briefly worked a desk job doing billing, then from October 2018 to December 2018, he managed a fast-food restaurant. AR 48-49, 181, 222, 226, 249.

In late 2018, he reported worsening low back and right leg pain, despite conservative treatment such as medications. AR 813, 826, 868, 884, 890. He testified that he quit his fast-food job because it was too uncomfortable for him to be on his feet for eight to ten hours a day. AR 48. He indicated that he looked for other employment, but he could not find a desk job that worked with his class schedule (he was working on his master's degree in human resources and organizational development, taking two classes a semester). AR 40, 48-49, 207.

In January 2019, Plaintiff underwent surgery to implant a spinal cord stimulator, which uses electrical signals to prevent the spine from sending a pain response to the brain; the box for the device was placed in his buttock, with leads going to the lower back to relieve pain. AR 826-27. He reported the spinal cord stimulator almost completely eliminated his pain. AR 839, 1742.

In February 2019, Plaintiff had a follow-up appointment with his primary care provider, Roger Harris, DO, regarding fatigue (treatment notes from prior appointments with Dr. Harris are not in the administrative record). AR 1739. Dr. Harris noted Plaintiff complained of ongoing fatigue for the last four months, unexplained by his lab

2

results. *Id.* Dr. Harris instructed Plaintiff to switch from Lexapro (escitalopram, an SSRI[4]) to Wellbutrin (bupropion, a norepinephrine and dopamine reuptake inhibitor), as fatigue could be a side effect of Lexapro. AR 1738. He also referred Plaintiff to a hematologist. AR 1739.

A few weeks later, Plaintiff met with hematologist Dania Khoulani, MD. AR 405-08. Her treatment notes reflect that Plaintiff had experienced similar fatigue a few years ago, which improved with a prescription for liquid ferrous sulfate (an iron supplement). *Id.* Dr. Khoulani noted Plaintiff's labs were mostly normal, but his iron panel from August 2018 was consistent with low iron levels, "though he [wa]s not yet anemic." *Id.* She noted Plaintiff was taking a daily iron supplement but indicated they would re-run his labs and compare; if his iron levels were the same, then he was not "absorbing and responding to oral iron" (in which case she would prescribe intravenous iron). *Id.* Plaintiff's labs showed normal iron levels with the oral supplement. *Id.*

In March 2019, Plaintiff met with urologist Joseph Haddad, MD. AR 842. He noted he had received testosterone injections for the last ten years but had recently stopped due to issues with insurance coverage. *Id.* He continued to complain of fatigue. *Id.* Dr. Haddad ordered blood work of his testosterone levels. AR 846. Plaintiff's testosterone levels suggested he suffered from hypogonadism and needed testosterone replacement. AR 901. Before receiving testosterone, however, in April 2019, Plaintiff suffered from a blood clot that required hospitalization. AR 792. He was discharged with a prescription for a blood thinner. *Id.* When he next met with urology in May 2019, still complaining of fatigue, the doctor noted he could not be on testosterone if he was pre-disposed to blood clots. AR 901, 905-06. The doctor indicated plaintiff needed to obtain clearance from hematology to start testosterone. *Id.* Plaintiff met with hematologist Dr. Khoulani the next day, who noted his March 2019 testosterone levels were "low normal." AR 362, 410-11. She instructed him to continue on blood thinners

---

[4] Selective Serotonin Reuptake Inhibitor.

for three months and hold off on testosterone therapy while they did a workup related to blood clots. AR 414. Plaintiff returned to Dr. Khoulani the next month, in June 2019. AR 362. Plaintiff continued to report fatigue and to request testosterone supplementation. AR 363. Dr. Khoulani suggested "cautious testosterone supplements" (preferably topical, "although will defer to urologist") "with very close testosterone monitoring to avoid high levels" while continuing to take a blood thinner. AR 367. She cautioned Plaintiff about the risks, given his blood clot, however. *Id*. When Plaintiff next met with Dr. Haddad, the doctor advised against testosterone replacement and instead instructed Plaintiff to determine how long he would need to be on blood thinners. AR 946-47.

In August 2019, Plaintiff began working at the customer service desk in a department store, handling returns (eight hours a day, four days a week). AR 222, 224, 250. This job required him to be on his feet almost the entire shift. AR 57-58, 250. Also in August 2019, Plaintiff sought treatment for back pain for the first time since January. AR 977. He reported that over the last month, he had developed upper back pain from the base of his neck to the level of his midline incision (near the belly button). *Id*. He stated his medications—Lyrica, naproxen (an NSAID),[5] and a muscle relaxer—were not helping. AR 777. He said the stimulator continued to help his sciatic pain and noted he recently increased the amplitude due to increased right buttock pain (which helped). AR 977. When the doctor recommended physical therapy, Plaintiff sought a second opinion, as he feared he had a new disc problem, this time in his upper back. AR 977, 985. A few days later, he met with a different neurosurgeon, Lynn Mubita, MD. AR 985-93. Dr. Mubita's treatment notes reflect that Plaintiff first noticed upper back pain after his stimulator surgery (which occurred in January 2019). *Id*. Dr. Mubita ordered an MRI[6] of Plaintiff's thoracic spine. *Id*.

---

[5] Non-steroidal anti-inflammatory drug.

[6] Magnetic Resonance Imaging.

4

Plaintiff reported to the emergency room on August 23, 2019, complaining of worsened back pain over the last few days. AR 777. His pain improved with injections of Toradol (an NSAID) and solumedrol (a steroid). AR 780. On August 28, 2019, he received the thoracic spine MRI, and he followed up with Dr. Mubita's office the next week. AR 774, 1007-14. Dr. Mubita explained the MRI showed mild disc bulging but nothing that would explain Plaintiff's pain (such as cord or nerve compression or facet instability). AR 1014. Dr. Mubita referred Plaintiff to the pain clinic. AR 1014, 1648-54. She also ordered a lumbar spine MRI and scoliosis study, the latter of which revealed kyphosis with a sagittal imbalance affecting the thoracic spine. AR 772, 1110-11, 1022.[7] Dr. Mubita proposed surgery to correct the sagittal imbalance, as well as thoracic fusion from T-5 to T-10, noting a recent CT[8] scan showed "a T7 compression fracture at the epicenter of [the] exaggerated thoracic kyphosis." AR 631, 643-51, 664-65, 1105-11, 1127-32. Dr. Mubita operated on November 22, 2019, and Plaintiff remained in the hospital until November 26, 2019. *Id.* After discharge, the surgical site became infected, and Plaintiff was readmitted to the hospital from December 7 to 10, 2019. AR 1227-28. By December 23, 2019, Plaintiff reported feeling up to working four to six hours a day, but Dr. Mubita refused to release him to return to work earlier than six weeks from surgery. AR 1397; *see also* AR 1242-49.

---

[7] "Normally, the spine has two gentle front-to-back curves. The lumbar (lower) spine has an inward curve called lordosis. The thoracic (middle) spine has an outward curve called kyphosis. Usually, these curves work in harmony to keep the body's center of gravity aligned over the hips and pelvis. However, if one of those curves becomes either too pronounced or too flat, the spine will be out of balance back-to-front. This is sagittal imbalance. Types . . . include[] . . . [k]yphosis[, in which] . . . the normal kyphosis of the thoracic spine increases to such a degree that the back appears hunched. Symptoms of sagittal imbalance include low back pain, difficulty walking, and inability to continually look straight ahead when upright. Sagittal imbalance can also cause chronic pain, fatigue, and difficulty with daily tasks. In some cases, sagittal imbalance may be associated with conditions that can put pressure on spinal nerves, leading to weakness, numbness, or pain."

[8] Computed Tomography.

In early February 2020, Plaintiff reported his thoracic back pain had returned, and imaging showed that the screws implanted during Dr. Mubita's surgery were loosening. AR 520, 1266, 1391. Dr. Mubita referred Plaintiff to another neurosurgeon, who recommended surgery to remove the hardware implanted by Dr. Mubita, since it was failing. AR 1266-73. Plaintiff initially told the Social Security Administration that the need for this second surgery caused him to quit his job at the department store—he took medical leave as he recovered from Dr. Mubita's surgery, and by the time he had exhausted his leave, he needed surgery to remove the hardware, as well as time to recover from that surgery. AR 255. He testified at the hearing, however, that he quit the job at the department store due to pain and needing to take too many breaks during shifts. AR 38. He ultimately worked there for about eight weeks in total. AR 37, 222.

Plaintiff underwent surgery to remove the failed hardware on March 13, 2020, and was discharged from the hospital on March 16, 2020. AR 495-511. During a telehealth follow-up appointment with Dr. Mubita on April 9, 2020, he reported his incision was healing well, but his pain was back to baseline now that his kyphosis was uncorrected. AR 1318-22, 1348. Although his pain was not as severe as it had been before surgery, he noted he was not standing as much. *Id.* He stated the only medication he needed for pain relief was the occasional Tylenol (acetaminophen). *Id.*

After he obtained his master's degree in April 2020, Plaintiff and his husband moved from Michigan to Hawaii. AR 40, 48-49, 207, 1318. In mid-July, Plaintiff established care with a primary care provider in Hawaii. AR 3379-80. He reported worsening mid-back pain and requested a referral to a neurosurgeon regarding his (now uncorrected) sagittal imbalance. *Id.* After two neurosurgeons were unsure if surgery could help Plaintiff, he sought another opinion from neurosurgeon Gregory Chow, MD, in late December 2020. AR 2336-39, 2538-39, 2837-39, 3459. Dr. Chow reviewed recent MRIs of Plaintiff's thoracic and lumbar spine and opined that his significant thoracic kyphosis was likely the cause of his back pain. AR 2338-39. Dr. Chow explained that given Plaintiff's age and prior surgeries, surgical correction would require

6

"some kind of pedicle subtraction osteotomy, possibly at multiple levels, along with a posterior fusion," which was "possible but . . . a very large and significant undertaking." *Id.* Plaintiff decided to proceed with surgery, and Dr. Chow operated to correct Plaintiff's kyphosis on January 26, 2021. AR 2357-2414. After Plaintiff's discharge on January 29, the surgical site became infected, and he was readmitted to the hospital from February 13 to 23, 2021. AR 2744, 3412.

At a follow-up appointment with Dr. Chow in March 2021, Plaintiff reported his pain was "much better" than before surgery and well controlled with hydrocodone and Lyrica once or twice a day at most. AR 2444-48. Dr. Chow instructed Plaintiff to increase activity and wean off pain medications as he felt comfortable. *Id.* Plaintiff met with Dr. Chow again in May 2021 and stated he was no longer taking opioids, his pain was well-controlled with Lyrica, and his posture had improved with surgery. AR 2465-69. He noted he no longer used the spinal cord stimulator, but the battery pack implanted in his buttock caused pain. *Id.* Dr. Chow surgically removed the spinal cord stimulator later that month. *Id.* No other treatment notes in the record reflect complaints of back pain.

In August 2021, Plaintiff met with a gastroenterologist to discuss abnormal labs showing anemia (low iron), despite iron supplementation. AR 2546-50. Plaintiff reported worsening fatigue that first onset three years ago. *Id.* Plaintiff had not sought treatment for fatigue since June 2019 (he had suffered several more blood clots in the interim, including in the fall of 2019). The gastroenterologist indicated he would order an endoscopy and colonoscopy to evaluate Plaintiff's iron deficiency anemia. *Id.* At this appointment, Plaintiff rated his pain at zero on the ten-point pain scale. *Id.*

Plaintiff filed the current application for DI benefits in July 2020. AR 69. He alleged disability since November 1, 2019, the month he underwent the kyphosis correction surgery that ultimately failed. *Id.* The Social Security Administration denied his request for benefits on initial review in September 2020 and on reconsideration in January 2021. AR 68-89.

7

The ALJ held a telephonic administrative hearing on November 18, 2021. AR 32-33. Both Plaintiff and a vocational expert (VE) testified at the hearing. *Id.* At the hearing, Plaintiff's attorney requested to amend the disability onset date to February 1, 2019, arguing that Plaintiff's work at the department store was an unsuccessful work attempt. AR 36-37.

The ALJ issued a written opinion on December 15, 2021, following the five-step process outlined in the regulations[9] to determine whether Plaintiff was disabled during the relevant time period. AR 13-23. The ALJ did not acknowledge Plaintiff's request to amend the onset date at the hearing, instead using November 1, 2019, as the alleged onset date. AR 15. The ALJ found Plaintiff last qualified for DI benefits on December 31, 2019, so he had to establish disability on or before that date. *Id.* The ALJ found Plaintiff suffered from severe impairments related to his back, including kyphosis. AR 16. The ALJ recognized that Plaintiff had been diagnosed as anemic but did not include it as a severe impairment. *Id.* To aid in steps four and five, the ALJ determined Plaintiff's RFC,[10] finding Plaintiff could perform light work—which includes the ability to lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently,[11] and

---

[9] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." ***Grindley v. Kijakazi***, 9 F.4th 622, 628 (8th Cir. 2021) (quoting ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* **20 C.F.R. § 404.1520(a)(4)**. The claimant bears the burden of persuasion to prove disability. ***Goff***, 421 F.3d at 790.

[10] RFC is "'what the claimant can still do' despite his or her physical or mental limitations." ***Lewis v. Barnhart***, 353 F.3d 642, 646 (8th Cir. 2003) (quoting ***Bradshaw v. Heckler***, 810 F.2d 786, 790 (8th Cir. 1987)).

[11] Occasionally is a term of art meaning "very little up to one-third" (or two hours) of an eight-hour workday. *See* **Social Security Ruling (SSR) 96-9p**, 61 Fed. Reg. 32278, 34480 (July 2, 1996); *see also **Dictionary of Occupational Titles (DOT)***, App. C, IV.c. Frequently means one-third to two-thirds (or six hours) of an eight-hour day. *See **DOT***, App. C, IV.c; **SSR 83-10**, 1983-1991 Soc. Sec. Rep. 24, at 29-30 (CCH Jan. 1, 1983).

to stand, walk, and sit approximately six hours in an eight-hour day[12]—with the following additional limitations:

> [Plaintiff] can occasionally perform postural activities, occasionally climb stairs and ramps, and occasionally work around hazardous machinery or unprotected heights. The claimant cannot climb ladders, ropes or scaffolds.

AR 18. Relying on VE testimony, the ALJ found Plaintiff could perform his past work as an airline customer service manager. AR 22. Thus, the ALJ found Plaintiff not disabled from November 1 to December 31, 2019. *Id.*

The Appeals Council denied Plaintiff's request for review on March 14, 2023 (AR 1-3), making the ALJ's decision that Plaintiff was not disabled the final decision of the Commissioner.[13] Plaintiff filed a timely complaint in this court on March 30, 2023 (Docs. 1, 5).[14] The parties briefed the issues (Docs. 30, 32-33) and consented to the exercise of jurisdiction by a United States magistrate judge (Doc. 14), and the case was assigned to me for final disposition.

## II. DISCUSSION

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[15] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[16] The court "do[es] not reweigh the evidence or review the factual record de novo."[17] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings,

---

[12] **20 C.F.R. § 404.1567(b)**; **SSR 96-9p**, 61 Fed. Reg. at 34481-82.

[13] *See* **20 C.F.R. § 404.981**.

[14] *See* **20 C.F.R. § 422.210(c)**.

[15] *Grindley*, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[16] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

[17] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

9

[the court] must affirm the decision."[18]

Plaintiff raises two issues with the ALJ's decision. First, Plaintiff argues that the ALJ erred by failing to include fatigue as a severe impairment at step two and by failing to include limitations related to fatigue in his RFC. Second, Plaintiff argues that he is more limited by his back pain than found by the ALJ in formulating his RFC.

### A. *Fatigue as a Severe Impairment*

During step two, whether evaluating a physical or mental impairment, the ALJ must first "determine whether [a claimant] ha[s] a medically determinable . . . impairment[]" that "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."[19] If the ALJ determines the claimant suffers from a medically determinable mental impairment, the ALJ must next decide whether the impairment is severe by evaluating the degree of functional limitation caused by the impairment.[20] An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities,"—for example, the ability to walk, sit, lift, reach, see, or hear.[21] An impairment is not severe if it "would have no more than a minimal effect on the claimant's ability to work."[22] "Severity is not an onerous requirement for the claimant to meet" (and has been described as a de minimus standard), "but it is also not a toothless standard."[23]

---

[18] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

[19] **20 C.F.R. § 404.1521**.

[20] *Id.*; **20 C.F.R. § 404.1522**.

[21] **20 C.F.R. § 404.1522**.

[22] ***Dixon v. Barnhart***, 353 F.3d 602, 605 (8th Cir. 2003) (quoting ***Simmons v. Massanari***, 264 F.3d 751, 755 (8th Cir. 2001)); *accord* **20 C.F.R. §§ 404.1522(a), 416.922(a)**.

[23] ***Kirby***, 500 F.3d at 708; ***Hudson v. Bowen***, 870 F.2d 1392, 1395 (8th Cir. 1989).

Plaintiff argues that the ALJ erred in failing to include chronic fatigue disorder as a severe impairment at step two, or conditions for which fatigue could be the primary symptom, such as anemia or hypogonadism. At step two, the ALJ acknowledged that Plaintiff "was diagnosed with anemia" but stated "he was not given an iron supplement due to normal iron panel results." AR 16. The ALJ did not otherwise discuss hypogonadism or fatigue in his opinion.

Treatment records reflect that Plaintiff complained of suffering from fatigue in February 2019 for the past four months (meaning he felt fatigued while working as the assistant manager of a fast-food restaurant, but he never gave fatigue as a reason for quitting that job; he also was taking classes for his master's degree). As noted by the ALJ, Plaintiff's iron levels were normal at that time with an oral iron supplement. Plaintiff continued to seek treatment for fatigue in the spring of 2019, focusing on testosterone supplements (one doctor noted Plaintiff's testosterone levels were on the low end of normal). Providers ultimately determined Plaintiff could not be on testosterone due to his susceptibility to blood clots. After June 2019, Plaintiff did not seek treatment for fatigue for more than a year and a half. Labs in the summer of 2021 reflected low iron, and Plaintiff complained of fatigue at an appointment to address his anemia in August 2021. At appointments for other ailments in the fall of 2019, 2020, and 2021, the "subjective complaints" section reflects that Plaintiff denied fatigue more often than not. *Compare* AR 452, 568, 1649, 2514, 2540, 3333, 3349, 3359, 3367, 3390 (denied fatigue), *with* AR 1011, 1398, 1619, 3381 (positive for fatigue).

In his disability application (in July 2020), Plaintiff alleged that anemia (in combination with other impairments) prevented him from working; he did not mention chronic fatigue or hypogonadism. AR 69. In a function report (in August 2020), he did state that he "get[s] winded or tired much more easily" and his "stamina and/or endurance is no longer what it once was." AR 239. At the hearing (in November 2021), Plaintiff did not testify about fatigue, anemia, or hypogonadism; he primarily claimed he was unable to work due to his back issues. *See* AR 47-48.

11

The Eighth Circuit has held that an ALJ does not commit reversable error by failing to mention an impairment when the claimant does not meet his step-two burden of showing the impairment had more than a minimal effect on the claimant's ability to work.[24]  The Eighth Circuit has also found significant when a claimant does not include the impairment in his disability application or testify that the impairment affects his ability to work.[25]  Here, neither the treatment records nor Plaintiff's submissions to the Social Security Administration support that fatigue affected his ability to work in 2019.  The ALJ did not err in failing to include fatigue or related impairments as severe impairments at step two.

### B. Plaintiff's Ability to Perform Light Work

Plaintiff argues that the ALJ erred in evaluating his subjective complaints, particularly his testimony that he could only be on his feet for thirty minutes before needing to lie down and rest.  When evaluating a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."[26]  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."[27]  The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility

---

[24] ***Baker v. Colvin***, 620 F. App'x 550, 557 (8th Cir. 2015).

[25] *See **Dunahoo v. Apfel***, 241 F.3d 1033, 1039-40 (8th Cir. 2001).

[26] ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord **Polaski***, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986).  The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*.  ***Jones v. Callahan***, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

[27] ***Black***, 143 F.3d at 386.

finding on "objective medical evidence to the contrary,"[28] or "inconsistencies in the record as a whole."[29] Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[30]

Plaintiff argues the ALJ erred by failing to explicitly mention his testimony that in 2019, he could walk for only thirty minutes and sit for only an hour before needing to lie down for forty-five minutes. AR 49-50. The ALJ acknowledged Plaintiff claimed his back pain "limited his ability to stand or walk" and that he "lays down or takes medication, both of which are effective in reducing his pain and increasing his ability to sit and stand for longer periods." AR 19. The ALJ ultimately found Plaintiff's statements concerning the "limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id.* The ALJ discussed the activities of daily living Plaintiff and his husband reported in function reports (AR 19), treatment records (AR 19-21), and medical opinions on his limitations (AR 21-22).

Here, as in the Eighth Circuit case *Schultz*, "the ALJ never expressly cited *Polaski*," but the ALJ did "cite[] and conduct[] an analysis pursuant to 20 C.F.R. §[] 404.1529 . . . , which largely mirror[s] the *Polaski* factors."[31] Considering the ALJ's discussion of RFC as a whole, his analysis "adequately, if not expressly, applied the *Polaski* factors."[32]

Plaintiff argues the ALJ erred by failing to consider his work history, which he argues supports a finding of disability. An ALJ does not commit reversible error simply "by failing to discuss . . . work history."[33] In addition, here, Plaintiff's work history is

---

[28] ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002).

[29] ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993).

[30] ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

[31] ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007).

[32] ***Id.***

[33] ***Moore v. Astrue***, 572 F.3d 520, 525 n.2 (8th Cir. 2009).

not as strong as he contends. Plaintiff did not work from 2011 to 2015 and filed for disability twice during that timeframe (his applications were denied). Plaintiff also did not work for much of 2019 (although Plaintiff changed his alleged onset date at the hearing to February 2019, the treatment records reflect Plaintiff reported the spinal cord stimulator implanted in January 2019 eliminated his pain, and he did not complain of back pain from January to August 2019).

"The ALJ is not required to address every functional limitation."[34] Here, it is clear the ALJ considered Plaintiff's subjective complaints of his limitations by summarizing Plaintiff's testimony (which acknowledged limitations in Plaintiff's ability to stand and walk). Although the ALJ did not specifically state he was discrediting Plaintiff's testimony that he could stand for only thirty minutes at a time, this finding is implicit in the ALJ's opinion, in which the ALJ states he is not fully crediting Plaintiff's subjective complaints as inconsistent with the record as a whole.

The ALJ suggested Plaintiff's activities of daily living were inconsistent with his testified limitations. AR 19. "Significant daily activities may be inconsistent with claims of disabling pain,"[35] but the ALJ must consider the claimant's limitations in performing these activities and their "quality, frequency, and independence."[36] Plaintiff argues the ALJ failed to acknowledge the quality of his activities of daily living. For example, he testified at the hearing (in November 2021) that it took only five minutes to vacuum his 600-square foot apartment and that he mowed the lawn with a self-propelled lawnmower that did not require pushing. AR 59-60. Plaintiff also notes his function report (in August 2020) reflects he could make only simple meals taking around ten minutes to prepare (give or take), but the ALJ acknowledged the meals Plaintiff prepared were "simple."

---

[34] *Thompson v. Berryhill*, No. 4:17-00689-CV-RK, 2018 WL 4205036, at *2 (W.D. Mo. Sept. 4, 2018) (citing *Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003)).

[35] *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005).

[36] *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).

AR 19, 234. Plaintiff reported his hobbies included "computers, [caring for] plants, tv, [and] being outside," but he elaborated that he was "not as active as [he] once was" and took "frequent breaks" to "stop or sit down due to pain" (the ALJ did not mention Plaintiff's need for frequent breaks). AR 19, 236. But Plaintiff also reported being able to walk one mile before needing to sit down and rest for ten minutes; and in his disability application a week earlier (in August 2020), he said he could be active for two to three hours before needing to lie down and take medications. AR 19, 221, 237. This is a far cry from his testimony at the hearing that he could only walk for thirty minutes before needing to lie down and rest for forty-five minutes.

Treatment records show Plaintiff "continue[d] to do a lot of walking" in August 2019, despite the recent onset of thoracic pain over the last month. AR 977. Later that month, he reported suffering pain "only after standing on his feet for about 3 hours." AR 777. In early September 2019, he reported his thoracic and lumbar pain were both worse after standing or walking for more than two hours. AR 1007. He did report trouble working at the department store due to being on his feet all day, however. AR 1648; *see also* AR 1111, 1127 (reporting thoracic pain worsened with standing, walking, or sitting, and relieved with lying down in fall 2019 prior to surgery). A month after the first surgery to fix the sagittal imbalance (which ultimately failed), Plaintiff reported feeling like he could work four to six hours a day at his department store job, which required being on his feet all day. AR 1397. After surgery to remove the failed hardware, in March 2020, Plaintiff reported being back to baseline for pain, and in April 2020, Plaintiff reported that he took only the occasional Tylenol for pain and that his pain was not as severe as before surgery, although he was not standing as much. AR 1318, 1352. In December 2020, Plaintiff reported progressively worsening back pain; despite this, he said he could stand or walk for two hours at a time. AR 2336. Overall, substantial evidence (Plaintiff's statements in both function reports and the treatment records) supports the ALJ's conclusion that Plaintiff's activities of daily living were

15

inconsistent with his testimony at the hearing (almost two years after his date last insured) that he could only be on his feet for thirty minutes before needing to rest.

Plaintiff argues that the ALJ erred by failing to discuss some of the medical evidence. The evidence Plaintiff relies on supports that Plaintiff suffered pain, but not necessarily pain that caused him to be more limited than found by the ALJ. Indeed, the treatment records reflecting Plaintiff's functional limitations, discussed in the previous paragraph, support that Plaintiff's pain did not limit him as much as he testified. "[A] deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."[37]

Overall, here, considering the ALJ's analysis of Plaintiff's RFC as a whole, the ALJ gave good reasons, supported by substantial evidence, for failing to fully adopt Plaintiff's subjective complaints of his limitations.

### III. CONCLUSION

The court **AFFIRMS** the decision of the Commissioner and directs the Clerk of Court to enter judgment for the Commissioner.

**SO ORDERED** on September 13, 2024.

_____
Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

---

[37] *Senne v. Apfel*, 198 F.3d 1065, 1067 (8th Cir. 1999).